CHUTZ, J.
Defendant seeks review in this appeal of a district court judgment ordering it to pay plaintiff $ 100,000.00 for breach of contract and $ 9,600.00 for mental anguish. We affirm the award for breach of contract, but reverse the award for mental anguish.
PROCEDURAL AND FACTUAL BACKGROUND
In August 2005, the New Orleans home of Harry D. Hoskins, III and his wife, Maureen R. Hoskins was severely damaged by Hurricane Katrina. The damage was so severe that the home had to be demolished. The Hoskins decided to rebuild their home at the same location, but in such a manner that it would be able to withstand future hurricanes and flooding. To aid with rebuilding costs, the Hoskins applied for a pilot reconstruction grant[1] from the Hazard Mitigation Grant Program (HMGP) sometime in 2009.
The HMGP was a cost reimbursement program that was intended to "[s]erve as a supplemental grant for eligible Road Home participants to implement measures that will permanently reduce or eliminate future damages and losses from natural hazards through their elevation or pilot reconstruction grant." The grants were funded by the Federal Emergency Management Agency (FEMA), but the State of Louisiana administered the HMGP through the Division of Administration, Office of Community Development (OCD). During 2009, OCD's Standard Operating Procedures manual provided that eligible homeowners could be reimbursed up to $ 100,000.00, "based on actual costs incurred," to either "elevate or reconstruct their damaged homes" to meet certain elevation standards. In exchange for a HMGP grant, homeowners agreed to build a home with certain mitigation features, to maintain flood insurance in perpetuity, and to notify any subsequent transferees of the home of the requirement to maintain flood insurance. The amount of a grant was calculated by deducting from the homeowner's total project costs (using actual costs for eligible expenses) any duplication of benefits the homeowner had already received from FEMA or Road Home programs, flood insurance, hazard insurance, or any other sources.
The Hoskins provided OCD with various documentation and building permits in support of their grant application. Sometime *327 in the middle of December 2009, they received a phone call from OCD notifying them they had been awarded a $ 100,000.00 HMGP grant and would need to complete certain paperwork in order to receive the grant. Accordingly, on December 22, 2009, the Hoskins went to OCD's office in New Orleans and signed a Voluntary Participation Agreement, a "Declaration of Covenants Running With The Land," and other documents. Additionally, on December 23, 2009, they signed an Advance Disbursement Agreement and Affidavit and an Advance Disbursement Request Application, and on December 24, 2009, a form authorizing the state to make electronic deposits to the Hoskins' bank account. Both the covenant agreement and the advance disbursement agreement/affidavit were in authentic form. All of the documents were prepared by OCD. Moreover, the covenant agreement was also signed by an OCD employee.
After the documents were executed, an OCD employee informed the Hoskins that once their bank routing number was received, the grant funds would be disbursed to their bank account within ten days. Before any funds were disbursed, OCD changed its method of calculating HMGP grants by using unit cost guidance (UCG)[2] instead of actual costs in calculating HMGP grants. The change was precipitated by a communication OCD received from FEMA requiring that UCG be used instead of actual costs in determining grant awards. Up until that point, OCD had used a homeowner's actual costs for purposes of calculating HMGP grants, and it had awarded and paid a number of grants on that basis. As noted previously, the procedure of using actual costs in calculating grants was even set forth in OCD's 2009 standard operating procedures manual
By calculating the Hoskins' entitlement to a HMGP grant using UCG instead of actual costs, their total project costs were substantially reduced. In fact, when UCG was used instead of actual costs, the Hoskins were not eligible to receive a HMGP grant once the benefits they had already received from other sources were deducted from their total project costs
At one point, OCD indicated it was willing to release the grant funds to the Hoskins "contingent upon FEMA's concurrence in doing so." OCD took this position on the basis that it had communicated to the Hoskins regarding the grant prior to the time that FEMA communicated to OCD that it should use UCG rather than actual costs in calculating HMGP grants. The record contains no indication that FEMA ever concurred in such action. In any event, OCD never disbursed any grant funds to the Hoskins.
Harry Hoskins died on June 4, 2013, leaving his entire estate to his surviving spouse, Maureen. On December 23, 2014, Maureen filed suit against the State of Louisiana, through the Division of Administration, OCD seeking $ 100,000.00 for breach of contract, plus all other resulting damages. At the conclusion of trial, the trial court ruled in favor of Maureen, stating:
The State has a charge to keep. It's made a promise. It is responsible for that commitment. [The] totality of the circumstances I've witnessed today, I find fault in [the] activity of the State to the neglect of the petitioner. I believe the State has breached its obligation and will render judgment accordingly.
*328 On April 3, 2018, the trial court signed a judgment awarding Maureen $ 100,000.00 for breach of contract and $ 9,600.00 for mental anguish. The State now appeals, raising two assignments of error.
ASSIGNMENT OF ERROR NUMBER ONE
OCD contends the trial court legally erred in finding a contract existed requiring it to pay $ 100,000.00 to Maureen since she failed to establish any of the essential elements of a binding contract. According to OCD, the documents presented by plaintiff in support of her contractual claim merely constituted an application for a HMGP grant, which the Hoskins had no guarantee of receiving. OCD argues that, at best, the documents established the existence of an aleatory contract, which under La. C.C. art. 1912, is one where the performance of either parties' obligation is dependent upon the occurrence of an uncertain event. OCD asserts the uncertain event in this case was a positive outcome to the Hoskins' grant application, which never occurred. Specifically, OCD maintains the evidence was insufficient to prove the Hoskins met FEMA's requirements for receiving a HMGP grant or complied with the conditions necessary to receive such a grant. Therefore, OCD contends it fulfilled the only obligation it owed to the Hoskins, which was to review the documentation they submitted to determine whether they were eligible to receive a HMGP grant under the strict guidelines established by FEMA.
The requirements for a valid contract are: (1) capacity; (2) consent; (3) a lawful cause; and (4) a valid object. See La. C.C. arts. 1918, 1927, 1966, 1971 ; Granger v. Christus Health Central Louisiana , 12-1892 (La. 6/28/13), 144 So.3d 736, 760-61. The burden of proof in an action for breach of contract is on the party claiming rights under the contract. La. C.C. art. 1831 ; Hornbeck Offshore Operators, LLC v. Cross Group, Inc. , 16-0174 (La. App. 1st Cir. 10/31/16), 207 So.3d 1141, 1146, writ denied, 16-2095 (La. 1/9/17), 214 So.3d 872. The existence of the contract and its terms must be proven by a preponderance of the evidence, either direct or circumstantial. Hornbeck Offshore Operators, LLC , 207 So.3d at 1146 ; Bond v. Allemand , 632 So.2d 326, 329 (La. App. 1st Cir. 1993), writ denied, 94-0718 (La. 4/29/94), 637 So.2d 468.
Whether a contract exists is a question of fact, and the trial court's determination of this issue will not be disturbed unless manifestly erroneous or clearly wrong. In evaluating the evidence needed to establish the existence or non-existence of a contract, the trier-of-fact is allowed to make credibility determinations. Read v. Willwoods Community , 14-1475 (La. 3/17/15), 165 So.3d 883, 888. Under the manifest error standard, if the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier-of-fact, it would have weighed the evidence differently. Amitech U.S.A., Ltd. v. Nottingham Construction Company , 09-2048 (La. App. 1st Cir. 10/29/10), 57 So.3d 1043, 1058, writs denied, 11-0866, 11-0953 (La. 6/17/11), 63 So.3d 1036 & 1043.
In the instant case, the trial court found a contract existed between the parties obligating OCD to pay Maureen $ 100,000.00. Based on our review, we find no manifest error in these factual findings. The record, including both the testimony and exhibits presented regarding the elements necessary for the formation of a valid contract, reasonably supports the trial court's findings.
*329 The first element required for a contract is capacity. Granger , 144 So.3d at 760. All persons have capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting. La. C.C. art. 1918. Moreover, the capacity to contract is presumed, and exceptions to the presumption of capacity must be convincingly established. Impson for Impson v. Succession of Impson , 17-1133 (La. App. 1st Cir. 2/21/10) (unpublished), 2018 WL 1751638, writ denied, 18-0452 (La. 5/11/18), 242 So.3d 567. In this case, no evidence was presented rebutting the presumption of capacity.
The second essential element of a contract is consent. Granger , 144 So.3d at 760-61. A contract is formed by the consent of the parties established through an offer and acceptance. La. C.C. art. 1927. "Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." La. C.C. art. 1927.
The trial court stated in its oral reasons for judgment that OCD "made a promise" and "has a charge to keep." These words reflect the trial court's obvious factual finding that all parties herein consented to an agreement that the Hoskins would receive a HMGP grant. The record supports this conclusion.
In particular, the covenant agreement, which was executed in authentic form and signed by both the Hoskins and an OCD representative on December 22, 2009, is indicative of a consensual agreement between the parties that a HMGP grant had been offered to and accepted by the Hoskins. The covenant agreement specifically states that the "Owner" (identified the Hoskins) "has been awarded a Hazard Mitigation Grant ... from the United States of America under the Department of Homeland Security Federal Emergency Management Agency ("FEMA ") Hazard Mitigation Program." Section 4 of the covenant agreement further provides, "As a recipient of Federally-funded hazard mitigation assistance under the Hazard Mitigation Program ... the Property Owner accepts the following conditions which shall encumber the property in perpetuity." The document then lists several conditions, including that the owners maintain flood insurance on the property in perpetuity and that they notify any subsequent transferees of the home of the requirement to maintain flood insurance. Finally, the covenant agreement explicitly states that the Hoskins are entering into the covenant agreement "in consideration of receipt of all HMGP Grant proceeds in order to mitigate future damages from hurricanes and similar natural disasters ." Moreover, this document was prepared by OCD, including the text stating that the Hoskins had been awarded a HMGP grant.
The additional documents prepared by OCD and signed by the Hoskins in close proximity to the covenant agreement are another circumstance indicating the parties' consent to the agreement that the Hoskins would receive a HMGP grant. In particular, the Hoskins signed an "Advance Disbursement AGREEMENT AND AFFIDAVIT" on December 23, 2009. That document states in its first paragraph that, "Harry D. Hoskins and Maureen R. Hoskins ... hereby agree to the following conditions and terms of this Grant Agreement ."[3] (Emphasis added.) Additionally, Section II of the advance disbursement *330 agreement/affidavit states, "[t]he Owner has been awarded a Hazard Mitigation Grant ... under the ... [HMGP Program]." Although only the Hoskins signed the advance disbursement agreement/affidavit, OCD prepared the document and furnished its text. OCD also furnished the Hoskins with an "Electronic Funds Transfer Enrollment Form," which Harry Hoskins signed on December 24, 2009, authorizing the state to make direct deposits into the Hoskins' bank account.
The next essential element of a contract is cause. Granger , 144 So.3d at 760-61. Under La. C.C. art. 1967, cause is defined as "the reason why a party obligates himself." An examination of the covenant agreement, as well as the advance disbursement agreement/affidavit, plainly reveals the cause of the agreement between the Hoskins and OCD. The covenant agreement reflects that the reason for its execution was for the Hoskins to receive a HMGP grant "in order to mitigate future damages from hurricanes and similar natural disasters ." (Emphasis added.) Likewise, the advance disbursement agreement/affidavit states that "[t]he purpose of this HMGP Grant is to mitigate losses from future damage resulting from hurricanes and similar natural disasters." Thus, the record clearly establishes a lawful cause for the agreement, which was to mitigate future damages from hurricane and natural disasters.
A valid object is the final element required for a contract. Granger , 144 So.3d at 760-61. The principal object of the agreement between the parties herein was clearly established by Maureen's testimony concerning the efforts she and Harry made for the purpose of obtaining a HMGP grant, as well as the various documents that were prepared by OCD and executed by the Hoskins. The valid object of the parties' agreement was for the Hoskins to receive a HMGP grant, thereby allowing them to undertake mitigation measures in building their new home to avoid future damages from natural disasters.
Accordingly, considering the entirety of the record, we find that the evidence presented by Maureen and accepted by the trial court was sufficient to support the trial court's finding that a contract existed between the parties. Further, we reject OCD's argument that the trial court erred in not deferring to its agency decision regarding this matter because it was the entity best positioned for interpreting and implementing the grant program. The dispositive issue in this matter was whether a valid contract existed between the Hoskins and OCD. The existence or non-existence of a contract was a question of fact for the trial court's determination rather than a matter within OCD's discretion. See Read , 165 So.3d at 888.
Additionally, OCD contends in general that Maureen failed to prove the Hoskins complied with the terms and conditions outlined in the documents they signed so as to entitle them to a HMGP grant. Maureen testified specifically at trial that she and her husband "kept up [their] part of the bargain" with OCD. However, OCD dismisses this testimony as being "entirely self-serving."
The trial court obviously accepted Maureen testimony that she and her husband fulfilled their obligations under the contract. Moreover, the record contains no evidence contradicting Maureen testimony. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference be given to the trier-of-fact's findings. Rosell v. ESCO , 549 So.2d 840, 844 (La. 1989). The manifest error-clearly wrong *331 standard of review is applied not only due to the trial court's better capacity to evaluate live witnesses, as compared with the appellate court's access to only a cold record, but also upon the proper allocation of trial and appellate functions between the respective courts. Therefore, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Henderson v. Nissan Motor Corporation , 03-606 (La. 2/6/04), 869 So.2d 62, 69. Based on our review, we cannot say the trial court was manifestly erroneous or clearly wrong in accepting Maureen's testimony on this issue.
We also find no merit in OCD's alternative argument that, at best, any contract between the parties was aleatory in nature, dependent upon an uncertain event - a positive outcome to the Hoskins' grant application - that OCD maintains never happened. Thus, OCD asserts it owed no obligation to the Hoskins under the aleatory contract. Contrary to OCD's arguments, the record indicates there was a positive outcome to the Hoskins' grant application. This positive outcome is reflected in the fact that both the covenant agreement and the advance disbursement agreement/affidavit indicate the Hoskins had been awarded a HMGP grant. The fact that someone from OCD telephoned the Hoskins to notify them they had been awarded a HMGP grant is further evidence of the positive outcome to their grant application.
Finally, OCD argues that neither the documents offered in support of Maureen's claim nor any other evidence established the Hoskins' entitlement to a grant in the maximum amount of $ 100,000.00. OCD contends it had discretion in the amount awarded, and the record contained insufficient evidence for the trial court to base the value of any grant. We disagree.
Although parol evidence is inadmissible to vary the terms of a written contract, when the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, parol evidence is admissible to clarify the ambiguity and to show the intention of the parties. McCarroll v. McCarroll , 96-2700 (La. 10/21/97), 701 So.2d 1280, 1286 ; Martin Exploration Company v. Amoco Production Company , 93-0349 (La. App. 1st Cir. 5/20/94), 637 So.2d 1202, 1205, writ denied, 94-2003 (La. 11/4/94), 644 So.2d 1048. As OCD points out, the documents relied upon by Maureen do not establish the amount of the grant awarded to the Hoskins. The failure of the documents to state the grant amount creates an uncertainty on this point. Accordingly, parol evidence was admissible to clarify the intention of the parties regarding the amount awarded to the Hoskins. See McCarroll , 701 So.2d at 1286 ; Martin Exploration Company , 637 So.2d at 1205.
In the instant case, Maureen testified an OCD employee notified the Hoskins by telephone in the middle of December 2009 that they had been awarded a HMGP grant in the amount of $ 100,000.00. She further testified that it was only after receiving this communication that she and her husband executed the covenant agreement, the advance disbursement agreement/affidavit, and the other documents they signed. The trial court apparently credited Maureen's testimony regarding what the Hoskins were told concerning the amount of the grant they were awarded. When factual findings are based on the credibility of witnesses, the factfinder's decision to credit a witness's testimony must be given great deference by the appellate court. Amitech U.S.A., Ltd. , 57 So.3d at 1058. In view of this standard of review, we cannot say the court was manifestly *332 erroneous in finding the intent of the parties was for the Hoskins to receive the maximum grant amount of $ 100,000.00.
ASSIGNMENT OF ERROR NUMBER TWO
In this assignment of error, OCD argues Maureen did not carry her burden of proving entitlement to mental anguish damages. OCD contends Maureen experienced only normal annoyance, worry, and inconvenience as a result of not receiving the HMGP grant, noting there was no evidence of her being treated for mental anguish as a direct result of its actions.[4] OCD further argues that because the Hoskins had already incurred the financial obligations of building their new home before even applying for the HMGP grant, they were in no worse position when they failed to receive grant funds than they were before applying for the grant.[5]
Under Louisiana contract law, damages for nonpecuniary loss such as emotional distress arising from a breach of contract are recoverable if the contract was intended to gratify a nonpecuniary interest, i.e. , the contract is about something other than money, and the obligor knew, or should have known, that his failure to perform would cause that kind of loss. La. C.C. art. 1998[6] ; Matherne v. Barnum , 11-0827 (La. App. 1st Cir. 3/19/12), 94 So.3d 782, 791, writ denied, 12-0865 (La. 6/1/12), 90 So.3d 442 ; Veal v. Wells Fargo Bank, N.A. , (E.D. La. 2016), 2016 WL 6024534 at *6. Whether the gratification of a non-pecuniary interest is the principal object of a contract is a question of fact that should not be set aside absent manifest error. Matherne , 94 So.3d at 791 ; Miller v. Thompson , 542 So.2d 96, 98 (La. App. 1st Cir.), writ denied, 544 So.2d 407 (La. 1989).
The trial court did not explicitly find that the object of the contract between the Hoskins and OCD was nonpecuniary, nor did it give any reasons justifying its award for mental anguish. To the extent the trial court may have concluded the gratification of a non-pecuniary interest was the principal object of the contract between the Hoskins and OCD, that conclusion was manifestly erroneous and unsupported by the record. As previously stated, the principal object of the contract between the parties was for the Hoskins to receive a HMGP grant to allow them to undertake certain mitigation measures in building their new home. This object was clearly pecuniary in nature and was not for the gratification of any significant non-pecuniary or intellectual interest.
*333 In support of the trial court's mental anguish award, Maureen cites several cases where mental anguish damages were awarded in situations involving contracts for construction of homes and their appurtenances. In those cases, which she asserts are similar to the present one, the courts determined that the contracts were also meant to gratify a nonpecuniary interest. Thus, Maureen contends the trial court properly concluded that the contract between the parties gratified a nonpecuniary interest since she and her husband were rebuilding what had been their long-time family home where they had raised their six children.
These contentions are meritless. The courts in Floyd v. Wells Fargo Home Mortgage Company , 848 F.Supp.2d 635, 645 (E.D. La. 2012) and Veal , 2016 WL 6024534 at *6, found that a mortgage or loan contract does not by its nature satisfy a nonpecuniary interest. Similarly, we find that the interest served by the contract between the Hoskins and OCD was strictly pecuniary in nature and was not intended to gratify any nonpecuniary interest. Accordingly, the trial court erred in awarding Maureen damages for mental anguish, and that award is reversed. See La. C.C. art. 1998.
CONCLUSION
For the reasons assigned, the portion of the trial court judgment awarding plaintiff, Maureen R. Hoskins, $ 9,600.00 for mental anguish damages is reversed. The trial court judgment is affirmed in all other respects. The costs of this appeal, totaling $ 4,916.50, are to be divided equally between plaintiff, Maureen R. Hoskins, and defendant, the State of Louisiana, Division of Administration, Office of Community Development.
REVERSED IN PART; AND AFFIRMED IN PART.

In a pilot reconstruction project, as opposed to an elevation project, the existing structure was demolished and a new code-compliance structure was constructed in its place.

UCG were guidelines FEMA established as to what it considered to be reasonable costs for pilot reconstruction projects.

The delineated terms and conditions included requirements that the Hoskins provide OCD with certain documents and permits and complete the mitigation project within certain time limits.

While the trial court's judgment does not expressly state whether the mental anguish award was for Harry or Maureen's mental anguish, the court's oral reasons indicate it was the latter. Specifically, the award was necessarily for Maureen's mental anguish since Harry died in June 2013, approximately three and a half years after the contract was breached in December 2009, and the trial court stated it was awarding damages of $ 1,200.00 per year for eight years (a total of $ 9,600.00).

The record does not clearly establish the exact date when construction began on the Hoskins' new home.

Louisiana Civil Code article 1998 provides:
Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.